UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:24-CR-20113-RS(s)
18 U.S.C. § 371
26 U.S.C. § 7201
26 U.S.C. § 7206(1)
18 U.S.C. § 1001(a)(3)
31 U.S.C. §§ 5314 & 5322
26 U.S.C. § 7212(a)

FILED BY_____ MP ____D.C.

Oct 31, 2024

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - Miami

UNITED STATES OF AMERICA

v.

DAN ROTTA and
SERGIO CERNEA,

    Defendants.
_____/

## SUPERSEDING INDICTMENT

The Grand Jury charges:

At all times relating to this Indictment, unless otherwise noted:

### Introduction

1.      DAN ROTTA ("ROTTA") was a naturalized United States citizen who, for decades, concealed millions of dollars in assets and income from the Internal Revenue Service ("IRS") in Swiss bank accounts that he failed to report either on his tax returns or on reports of foreign bank and financial accounts. At times, the total value of ROTTA's unreported foreign assets reached approximately $20 million, and, between 2001 and 2020, ROTTA's investments generated tens of millions of dollars in unreported income. His conduct caused a significant tax loss to the United States.

2.      Over the years, ROTTA conspired with his longtime friend and Brazilian citizen, SERGIO CERNEA ("CERNEA"), among others, to defraud the United States by concealing ROTTA's offshore assets and income from the IRS. ROTTA, CERNEA, and others: (i) obstructed an IRS audit by falsely denying that ROTTA had any foreign bank or financial accounts; (ii) listed CERNEA as the nominee owner of ROTTA's Swiss bank accounts; (iii) provided, and caused others to provide, false documents to the IRS; (iv) filed a false and fraudulent petition in the United States Tax Court; (iv) created sham trust structures designed to conceal ROTTA's assets and income; and (v) filed false tax returns that substantially underreported ROTTA's income. When it became evident that Swiss banks were cooperating with the United States and ROTTA could no longer hide his foreign financial accounts from U.S. authorities, ROTTA submitted a false application to the IRS's Voluntary Disclosure Practice, in which he admitted he had foreign financial accounts, but falsely claimed most of the assets in those accounts belonged to CERNEA to limit his exposure to tax penalties.

## Individuals and Entities

3.      ROTTA was a naturalized United States citizen who lived on Fisher Island, Florida and in Aventura, Florida.

4.      ROTTA was born in Romania in 1946. Shortly thereafter, ROTTA and his family moved to Israel and then Brazil. ROTTA moved to the United States in or around the 1970's and became a naturalized United States citizen in 1978. ROTTA has resided in the United States ever since and remained a citizen of Romania and Brazil.

5.      ROTTA, a retired businessman, moved to Fisher Island, Florida, in or around 2001. Prior to retirement, ROTTA ran import and export businesses in New York, including a watch and

jewelry business, and an electrical distribution company. During that time, ROTTA resided in New York at multiple residences, including on Park Avenue and East End Avenue in Manhattan, and in Oyster Bay, Long Island.

6.     CERNEA was a Brazilian citizen who resided in Sao Paolo, Brazil. CERNEA was born in Romania in 1947 and he and his family moved to Brazil shortly thereafter. CERNEA was not a United States citizen.

7.     CERNEA was ROTTA's longtime family friend. Their families were close both in Romania and Brazil. ROTTA and CERNEA have described themselves as being as close as brothers, and at times have referred to each other as cousins.

8.     Conspirator 1 was a family friend of ROTTA who was a French citizen and resident, who, at some point, also became a citizen of Israel.

**Income and Foreign Financial Account Reporting Obligations of U.S. Taxpayers**

9.     U.S. citizens and residents who received income exceeding a threshold amount in any one calendar year were required to file a Form 1040, U.S. Individual Income Tax Return ("Form 1040"), for that calendar year with IRS by on or around April 15 of the following year. On that tax return, U.S. taxpayers were obligated to report their worldwide income, including all income earned from assets in foreign financial accounts (such as bank, brokerage, and securities accounts), among other types of income.

10.     U.S. taxpayers also had an obligation to report to the IRS on Schedule B, "Interest and Ordinary Dividends" ("Schedule B") of their Form 1040 whether they had a financial interest in, or signature authority over, a financial account located in a foreign country in a particular year

by checking either "Yes" or "No" in the appropriate box, and by identifying the appropriate countries where the foreign financial account(s) were maintained.

11.     In addition, U.S. taxpayers who had a financial interest in, or signature authority over, one or more financial accounts in a foreign country with an aggregate value of all such foreign financial accounts of more than $10,000 at any time during a particular year, were required to file with the U.S. Department of Treasury a Report of Foreign Bank and Financial Accounts ("FBAR"), using Form TD-F 90-22.1 prior to January 1, 2013, and, after January 1, 2013, the renamed FinCEN Form 114. On an FBAR, a taxpayer was required to disclose, among other things, the name of each financial institution at which each account was held, the account numbers, and the maximum value of each account during the calendar year. For calendar years up through 2015, the filing deadline for an FBAR was on or about June 30 of the following year. For calendar years 2016 forward, the filing deadline for an FBAR was on or about April 15 of the following year, though filers failing to meet the FBAR annual due date of April 15 were granted an automatic extension to October 15 each year.

12.     Article 27 of the Agreement on the Swiss Banks' Code of Conduct with Regard to the Exercise of Due Diligence between the Swiss Bankers Association and the signatory banks required, in part, that Swiss banks document the beneficial owner of the assets in a particular account. Generally, the beneficial owners of the assets were natural persons, and the banks were required to document the beneficial owner's identity on a Form A, a standard form promulgated by the Swiss Bank Association for documenting the beneficial owners' identity.

4

**ROTTA's Scheme to Conceal Assets and Income in Swiss Accounts**

13.     ROTTA owned and/or controlled at least two dozen financial accounts in Switzerland between 1985 and 2020. ROTTA held his accounts using a pseudonym, foreign nominees, and layered ownership structures designed to conceal his assets and income from the IRS. Regardless of the structure, ROTTA was the true owner of the assets in those accounts.

**I.     ROTTA Held Swiss Bank Accounts from 1985 through 2008.**

14.     Between 1985 and 2008, ROTTA held assets in Swiss bank accounts using false names and offshore corporate structures designed to conceal his accounts from the IRS.

15.     On or about January 3, 1985, ROTTA opened an account in Switzerland at a predecessor of Credit Suisse AG (referred to herein collectively with its predecessors as "Credit Suisse") in the name of a pseudonym. In connection with the opening of the account, ROTTA executed documents that allowed him to use a pseudonym instead of his real name on account documents. ROTTA's pseudonym account remained open until around 1989, at which point ROTTA transferred the account's assets to new accounts that he opened at Credit Suisse held in the name of Vima, Inc ("Vima").

16.     In or around March 1989, ROTTA opened accounts in Vima's name at a corporate predecessor of UBS AG (referred to herein collectively with its predecessors as "UBS") and Credit Suisse. Vima was a nominee entity owned and controlled by ROTTA. Vima was a bearer-share corporation – meaning whoever held Vima's share certificates owned Vima. On paper, a Liechtenstein foundation called the NAD Foundation held Vima's share certificates for ROTTA's benefit. In reality, the tiered corporate structure was designed to conceal ROTTA's ownership and control of the Vima accounts. In connection with the opening of the accounts, ROTTA identified himself as the sole beneficial owner of the assets in the accounts on the account-opening

5

documents that recorded such information, known as a Form A, and gave himself signature authority over the accounts. On the account opening documents, ROTTA identified himself as a U.S. resident, and listed his residence as his address on Park Avenue in New York. ROTTA maintained the Vima accounts at UBS and Credit Suisse until in or around 2001, at which point he transferred the assets to new accounts held under a different ownership structure.

17.    In or around April 1998, ROTTA opened two new foreign financial accounts in his own name at another Swiss bank, Bank Julius Baer. In connection with the opening of the accounts, ROTTA identified himself on the Form A as the sole beneficial owner of the assets in the accounts and gave himself signature authority over the accounts. ROTTA also identified himself as a resident and citizen of Brazil on all relevant account documents.

18.    Two months later, in or around June 1998, ROTTA signed an instruction directing Bank Julius Baer to close those accounts and transfer the assets to new accounts held in the name of Pevima Limited, a nominee entity and bearer-share corporation formed in the British Virgin Islands. In connection with the opening of the Pevima Limited accounts, the bank recorded ROTTA as having power of attorney authority over the accounts and listed him on the Form A as the sole beneficial owner of the assets in at least one of the accounts. ROTTA also caused Bank Julius Baer to identify him as a resident and citizen of Brazil on all relevant account documents. ROTTA maintained the Pevima Limited accounts at Bank Julius Baer until around 2001.

19.    Between November 2000 and July 2001, ROTTA closed the Pevima and Vima accounts at Credit Suisse, UBS, and Bank Julius Baer and directed the banks to transfer the assets to new accounts at those banks held in the name of Citaro International Business Corporation LTD. ("Citaro"). ROTTA's transfer of his assets to new accounts held in Citaro's name coincided with

6

new Swiss bank requirements for identifying U.S. accountholders that took effect in or around January 2001.

20.     In or around October 2000, ROTTA hired Beda Singenberger and his fiduciary firm Sinco Treuhand AG to create the Citaro ownership structure. Like Vima, Citaro was a nominee entity owned and controlled by ROTTA. On paper, Citaro was a bearer-share corporation formed in the British Virgin Islands, and its shares were held by the NAD Foundation for ROTTA's benefit. Despite the layered structure, ROTTA was the owner of, and controlled the assets in, the Citaro accounts. In connection with the opening of the accounts, ROTTA was identified on Forms A as the sole beneficial owner of the Credit Suisse and Bank Julius Baer Citaro accounts, and also executed a form for Sinco Treuhand identifying himself as the beneficial owner of the assets in the Citaro accounts. ROTTA also caused UBS, Credit Suisse, and Bank Julius Baer to identify him only as a resident and citizen of Brazil on all relevant account documents, even though he was a citizen and full-time resident of the United States.

21.     By 2001, ROTTA had over $19 million in net assets in Switzerland spread over the Citaro accounts at UBS, Credit Suisse, and Bank Julius Baer. The assets in those accounts generated substantial income each year that ROTTA used to fund his lifestyle in the United States. Between 2001 and 2003, ROTTA caused the transfer of over $1,500,000 from the Citaro accounts to his accounts in the United States, including, but not limited to, the following:

7

| Transfer From | Transfer To | Approximate Date | Approximate Amount |
|---|---|---|---|
| UBS | ROTTA | March 13, 2001 | $600,000 |
| Credit Suisse | ROTTA | November 7, 2001 | $83,000 |
| Credit Suisse | ROTTA | February 7, 2002 | $400,000 |
| Bank Julius Baer | ROTTA | November 4, 2002 | $150,000 |
| Credit Suisse | ROTTA | February 19, 2003 | $350,000 |
| Bank Julius Baer | ROTTA | May 5, 2003 | $400,000 |
| | | Total: | $1,983,000 |

22.     In or around 2003, ROTTA closed the Citaro accounts at UBS, Credit Suisse, and Bank Julius Baer and transferred the assets to newly opened accounts at those banks held under the name of Sky Delta Limited ("Sky Delta"), a Hong Kong corporation.

23.     Sky Delta was another nominee corporate entity created by Singenberger and his associates, and its ownership structure mirrored Citaro's: the NAD Foundation held Sky Delta's shares in trust for ROTTA's benefit. Despite the layered structure, ROTTA owned and controlled the assets in the Sky Delta accounts. In connection with the opening of the Sky Delta accounts, ROTTA was identified as the sole beneficial owner on the Forms A for each of the Sky Delta accounts at UBS, Credit Suisse, and Bank Julius Baer. ROTTA also caused UBS, Credit Suisse, and Bank Julius Baer to identify him only as a resident and citizen of Brazil on all relevant Sky Delta account documents even though he was a citizen and full-time resident of the United States.

24.     Between 2003 and 2008, the Sky Delta accounts at UBS, Credit Suisse, and Bank Julius Baer collectively held assets valued between approximately $14 and $23 million that annually produced substantial investment income. ROTTA regularly used the income generated by the assets in the Sky Delta accounts to fund his lifestyle in the United States. Between 2004 and 2008, ROTTA caused the transfer of over $5,700,000 from the Sky Delta accounts to his domestic accounts, including accounts in his own name and accounts held in the name of Pevima

8

Corporation, a New York and Florida corporation that ROTTA used to hold real estate and pay

personal expenses, including, but not limited to, the following:

| Transfer From | Transfer To | Approximate Date | Approximate Amount |
|---|---|---|---|
| Credit Suisse | ROTTA | March 1, 2004 | $425,000 |
| Bank Julius Baer | Pevima Corporation | May 17, 2004 | $115,000 |
| Credit Suisse | ROTTA | September 22, 2004 | $125,000 |
| Bank Julius Baer | Pevima Corporation | November 15, 2004 | $500,000 |
| Bank Julius Baer | Pevima Corporation | March 05, 2005 | $150,000 |
| Credit Suisse | ROTTA | May 9, 2005 | $500,000 |
| Bank Julius Baer | Pevima Corporation | February 21, 2006 | $290,000 |
| Bank Julius Baer | Pevima Corporation | March 16, 2006 | $285,000 |
| Credit Suisse | Pevima Corporation | May 26, 2006 | $100,000 |
| Credit Suisse | Pevima Corporation | August 14, 2006 | $500,000 |
| Bank Julius Baer | Pevima Corporation | January 24, 2007 | $500,000 |
| UBS | Pevima Corporation | April 19, 2007 | $200,000 |
| Credit Suisse | Pevima Corporation | August 29, 2007 | $500,000 |
| Bank Julius Baer | Pevima Corporation | January 9, 2008 | $300,000 |
| Credit Suisse | ROTTA | May 26, 2008 | $500,000 |
| Credit Suisse | Pevima Corporation | November 12, 2008 | $500,000 |
| Bank Julius Baer | Pevima Corporation | December 5, 2008 | $250,000 |
| | | Total: | $5,740,000 |

25.     ROTTA failed to file an FBAR between calendar years 2001 and 2008 reporting

his interest in either the Citaro or Sky Delta accounts. Furthermore, ROTTA filed and/or caused

the filing of false Forms 1040 for tax years 2001 through 2008 that falsely and fraudulently: (i)

underreported his total income by omitting the income generated by his investments in those Swiss

accounts, and (ii) failed to report his ownership interest in those Swiss accounts on Schedules B

of his Form 1040.

26.     In or around 2009, ROTTA's domestic life insurance providers asked him to

explain the source of the premium payments he had made from his Swiss accounts. In response,

ROTTA and CERNEA provided false written statements to the life insurance providers, explaining

that CERNEA was paying ROTTA's life insurance premiums on behalf of ROTTA's deceased

uncle for the benefit of ROTTA's son. The deceased uncle died in Brazil in 1971, over twenty years before ROTTA's son's birth.

## II.     ROTTA Closed and Reopened His Foreign Financial Accounts between 2008 and 2009 in Response to the United States' Investigation of Swiss Banks.

27.     In or around 2008, it was publicly reported that UBS was under criminal investigation in the United States for helping U.S. taxpayers evade income taxes by concealing their accounts behind offshore corporate structures. ROTTA followed the news reports of the investigation, and, around that time, began transferring assets from the UBS Sky Delta accounts to the Credit Suisse Sky Delta account.

28.     In or around December 2008, ROTTA established a relationship with a new Swiss bank, Banque Bonhôte et Cie ("Banque Bonhôte" or "Bonhôte") and opened another Sky Delta account at Banque Bonhôte. In or around 2009, ROTTA caused the transfer of the remaining assets in the UBS Sky Delta accounts to the new Banque Bonhôte Sky Delta account and terminated his relationship with UBS. In connection with the account opening, ROTTA was identified as the sole beneficial owner on the Form A for the Bonhôte Sky Delta account. ROTTA was identified only as a citizen and resident of Brazil on the Bonhôte Sky Delta account documents despite being a citizen and full-time resident of the United States.

29.     In or around March 2009, it was publicly reported that U.S. authorities had expanded their criminal investigation to include enablers like Singenberger and his associates for helping U.S. taxpayers set up complicated offshore structures to hold their undeclared Swiss bank accounts and thereby evade their income taxes and reporting requirements. Shortly thereafter, ROTTA engaged Bonhôte Trust SA ("Bonhôte Trust"), a fiduciary services company owned by Banque Bonhôte, to replace Singenberger and Sinco Treuhand as his Swiss fiduciary.

30.     ROTTA worked with Bonhôte Trust to create a new nominee structure to hold his assets. To transition ROTTA's assets from the Sky Delta accounts to the new structure, ROTTA caused the transfer of his assets in the Sky Delta accounts at Credit Suisse, Bank Julius Baer, and Bonhôte to new accounts held in ROTTA's name at those banks. As a result, in or around April 2009, ROTTA closed the Credit Suisse, Bank Julius Baer, and Bonhôte Sky Delta accounts and ordered the banks to transfer the assets to new accounts opened in his own name at those banks.

31.     Between April and September 2009, ROTTA held accounts in his own name at Credit Suisse, Bank Julius Baer, and Banque Bonhôte. ROTTA identified himself on the Forms A as the beneficial owner of the assets in the accounts held in his own name and gave himself signature authority over those accounts. On all relevant account documents, ROTTA identified himself as a resident and citizen of Brazil, and signed false certifications attesting that he was neither a U.S. citizen nor a U.S. person subject to United States income tax withholding requirements. At that point, ROTTA had been a U.S. citizen and resident for over 30 years.

32.     By September 2009, ROTTA closed the accounts in his own name at Credit Suisse, Bank Julius Baer, and Banque Bonhôte and directed the banks to transfer the assets in those accounts to new accounts at Credit Suisse and Banque Bonhôte held in the name of Edelwiss Corporate Limited ("Edelwiss"). Edelwiss was a nominee corporate entity formed in the British Virgin Islands by Bonhôte Trust. On paper, Edelwiss's shares were held by The Putzo Foundation, a Liechtenstein Foundation established by Bonhôte Trust, for ROTTA's benefit. Despite the layered structure, ROTTA owned the assets in the Edelwiss accounts. In connection with the opening of the Edelwiss accounts, ROTTA was recorded on the Forms A as the sole beneficial owner of the assets in the Edelwiss accounts. ROTTA continued to identify himself only as a

11

Brazilian national and resident on the relevant Edelwiss account documents, even though he was a citizen and full-time resident of the United States.

33.     In conjunction with the opening of the Edelwiss accounts, ROTTA entered a contract to rent a safe deposit box at Credit Suisse. To pay the fees associated with the safe deposit box rental, ROTTA opened an account in his own name. ROTTA maintained that account between 2009 and 2014. On account opening documents, ROTTA identified himself as the owner of the account and as a Brazilian citizen and resident, even though he was a citizen and full-time resident of the United States.

34.     Between 2009 and 2011, the Edelwiss accounts at Credit Suisse and Banque Bonhôte collectively held substantial assets that annually produced substantial income. Similar to ROTTA's prior structures, Bonhôte Trust formally managed the Edelwiss accounts, and ROTTA lacked formal signature authority over the accounts. Despite the appearance that ROTTA lacked control over the accounts, ROTTA controlled the accounts and instructed Credit Suisse and Bonhôte in the disbursement of account assets. Indeed, between 2009 and 2011, ROTTA caused the transfer of millions of dollars from the Edelwiss accounts to his domestic accounts, including but not limited to the following:

| Transfer From | Transfer To | Date | Amount |
|---|---|---|---|
| Bonhôte | Pevima Corporation | October 26, 2009 | $450,000 |
| Credit Suisse | Pevima Corporation | November 3, 2009 | $400,000 |
| Credit Suisse | Pevima Corporation | May 18, 2010 | $300,000 |
| Credit Suisse | Pevima Corporation | June 14, 2010 | $375,000 |
| Credit Suisse | Pevima Corporation | October 28, 2010 | $325,000 |
| Credit Suisse | Pevima Corporation | February 7, 2011 | $350,000 |
| Credit Suisse | Pevima Corporation | May 31, 2011 | $302,000 |
| Credit Suisse | Pevima Corporation | September 19, 2011 | $299,000 |
| | | **Total:** | **$2,801,000** |

35.     ROTTA failed to file an FBAR for calendar years 2009 through 2011 reporting his interest in either the accounts in his own name and in the Edelwiss accounts. Furthermore, ROTTA filed and/or caused the filing of false Forms 1040 for tax years 2009 through 2011 that falsely and fraudulently: (i) underreported his total income by omitting the income generated by his investments in those accounts, and (ii) failed to report his ownership interest in those accounts on Schedules B of his Form 1040.

## III.     ROTTA and CERNEA Conspired to Prevent his UBS Accounts from Being Disclosed to the IRS.

36.     On or about February 18, 2009, UBS entered into a Deferred Prosecution Agreement with the United States in which it admitted that it conspired to defraud the United States. As part of the agreement, it agreed to immediately provide the United States government with the identities of, and account information for, certain United States customers. It was widely reported that the disclosure of account information was an unprecedented, paradigm-shifting event in Swiss banking that for decades, had shielded account information behind what had seemed, until then, to be an impregnable legal wall of secrecy.

37.     In or around 2010, the Swiss Federal Tax Administration ("SFTA") notified ROTTA that his UBS Vima account records had been flagged for potential disclosure by UBS in response to an IRS summons. The SFTA was required to notify ROTTA as the beneficial owner of the assets in the Vima account to give him an opportunity to challenge the disclosure to the IRS. In response, ROTTA provided false documents to the SFTA attesting that he was not a U.S. taxpayer and that he lived in Brazil. He falsely attested in a signed affidavit that:

> I hereby declare that I am a Brazilian citizen . . . and that in the last 15 years I have had full time employment and resided at various addresses in Sao Paulo, Brazil as stated by the attached affidavits.

13

CERNEA also signed a false affidavit claiming that ROTTA resided in Brazil between 1995 and 2010, which ROTTA also provided to the SFTA in support of his claim he was not a U.S. person. In reality, ROTTA resided in New York and Florida between 1995 and 2010, and ROTTA was not employed in Brazil. The SFTA accepted ROTTA and CERNEA's false representations that ROTTA was neither a U.S. person nor subject to U.S. income tax and accordingly did not transmit the Vima accounts to the IRS under ROTTA's name.

38.     However, records in the UBS Vima account showed that ROTTA's close relative who also lived in the United States ("Relative 1") had signature authority over a safe deposit box account tied to the UBS Vima account. The SFTA ultimately produced records related to ROTTA's UBS Vima account under Relative 1's name in or around 2011.

### IV.     ROTTA Conspired with CERNEA and Others to Change his Offshore Account Structure in 2011 in Response to an IRS Audit.

39.     In or around July 2011, the IRS began an audit of Relative 1 based in part on the UBS Vima account documents it received from the SFTA. On or about August 4, 2011, an IRS Revenue Agent interviewed Relative 1. Shortly thereafter, in or around September 2011, the Revenue Agent closed the audit of Relative 1 and referred ROTTA for audit as the possible owner of the assets in the UBS Vima account. Not long after the IRS interviewed Relative 1, ROTTA enlisted CERNEA to serve as the nominee owner of the Edelwiss accounts to further conceal his ownership and control of the assets in the Edelwiss accounts from the IRS.

40.     Between October and November 2011, ROTTA worked with Bonhôte Trust to create a new structure, the Putzo Settlement, that made it appear, on paper, that CERNEA owned the assets in the Edelwiss accounts. The Putzo Settlement was a Liechtenstein trust nominally settled by CERNEA to hold the shares of Edelwiss for the benefit of ROTTA and his family.

ROTTA was named the "protector" of the Putzo Settlement, in which capacity ROTTA maintained control over the accounts without expressly being named as a beneficiary. ROTTA and CERNEA caused Credit Suisse and Banque Bonhôte to remove ROTTA as the beneficial owner of the assets in the Edelwiss accounts and caused CERNEA to be listed as the sole beneficial owner for the first time on new Forms A executed in November 2011.

41.     Between 2011 and 2016, CERNEA served as the nominee owner of the Edelwiss accounts and met with various Swiss bankers and other fiduciaries in that capacity. Despite the nominal change in ownership, ROTTA maintained dominion and control over the assets in the Edelwiss accounts by directing the investment of his assets and their distribution for his own benefit, including, but limited to, taking the following actions:

a.     In or around October 2014, ROTTA sent a detailed list of bond purchase instructions from his AOL email address to Bonhôte Trust.

b.     In or around July 2016, ROTTA sent an instruction from his AOL email address to Bonhôte Trust to transfer $30,000 from the Bonhôte Edelwiss account to a luxury watch dealer in Miami ("Miami Watch Dealer"). When asked for an explanation by Bonhôte representatives, ROTTA explained that Sergio had purchased watches from the Miami Watch Dealer. When asked if Sergio could confirm the purchase, ROTTA responded:

> For obvious reasons Sergio wants NO communications. That is why you NEVER received or sent communications to him directly. I believe th at [*sic*] was made clear years ago.

In reality, ROTTA transferred the money as payment for watches ROTTA purchased.

42.     ROTTA failed to file an FBAR between calendar years 2002 and 2016 reporting his interest in the Edelwiss accounts. Furthermore, ROTTA filed and/or caused the filing of false

Forms 1040 for tax years 2012 through 2016 that falsely and fraudulently: (i) underreported his total income by omitting the income generated by his investments in the Edelwiss accounts, and (ii) failed to report his ownership interest in the Citaro accounts on Schedules B of his Form 1040.

### V.      ROTTA Conspired with CERNEA and Others to Obstruct an IRS Audit and Subsequent Tax Court Litigation.

43.      In or around 2011, the IRS began an audit of ROTTA to determine, among other things, whether he had any unreported foreign financial accounts and earned income from the assets in those accounts for tax years 2008 through 2010. The IRS later expanded its audit to include tax years 2011 through 2013. To conceal the accounts and obstruct the audit, ROTTA falsely denied having unreported foreign financial accounts or income and conspired with CERNEA and others to conceal his offshore accounts from the IRS. In or around 2014, the IRS assessed deficiencies related to ROTTA's unreported income in 2008 through 2010. ROTTA challenged those assessments in United States Tax Court by filing a petition that repeated the same false claims that he had presented during the audit. During the litigation, CERNEA and Conspirator 1 provided additional false documents and testimony to the IRS in support of those fabricated claims. In or around 2017, based on the false documents, statements, and testimony ROTTA, CERNEA, and Conspirator 1 provided during the litigation, the IRS consented to settle the Tax Court litigation and related audit with ROTTA and agreed that ROTTA owed neither additional income tax nor penalties for 2008 through 2013.

44.      Throughout the audit and subsequent United States Tax Court litigation, ROTTA employed numerous accountants and attorneys to represent him before the IRS and before the United States Tax Court, including Accountant 1, Accountant 2, Attorney 1, Attorney 2, Attorney 3, and Attorney 4, among others (collectively, the "Audit Representatives").

**A.    ROTTA Falsely Denied Having Foreign Financial Accounts.**

45.    Throughout the audit, ROTTA stonewalled the IRS by falsely denying that he owned or controlled any foreign financial accounts and causing the Audit Representatives to falsely deny that he had any foreign financial accounts. ROTTA denied having unreported foreign financial accounts in telephone interviews with the IRS, during in-person interviews, in written correspondence to the IRS, and even during two different sworn depositions taken under penalties of perjury with the IRS. ROTTA also caused the Audit Representatives to repeat the same false claims. ROTTA knew that the SFTA had not provided the IRS records of either the Sky Delta or Edelwiss accounts, and he, therefore, knew that his blanket denials and those made by the Audit Representatives could not be rebutted with documentary evidence.

**B.    ROTTA Conspired with CERNEA and Others to Provide False Explanations for ROTTA's Receipt of Foreign Funds.**

46.    By November 2012, the IRS had obtained copies of ROTTA's domestic bank records, which revealed that, during 2008, ROTTA received $1,450,000 in transfers from the Sky Delta accounts. When confronted with this fact, ROTTA told an evolving story to explain the source of the funds. At the outset, ROTTA and his Audit Representatives falsely claimed that the money he received in 2008 from Sky Delta was a loan from two friends who were non-U.S. persons, but he had no documentation to support the loan. ROTTA claimed that he would repay the loan when he sold his home on Oyster Bay.

47.    Eventually, ROTTA provided false documents to the IRS through the Audit Representatives to support the fabricated assertion that the funds received in 2008 from the Sky Delta accounts constituted a loan, allegedly received from two individuals who were Romanian nationals and citizens and residents of France (hereinafter, the "French Family Friends"). Among

17

the false documents ROTTA provided to the IRS was a copy of a promissory note purportedly evidencing the loan, along with letters seemingly intended to bolster the note's legitimacy, including: (i) a letter from a New York attorney who had represented ROTTA and was a personal friend ("Attorney 5"); (ii) a letter from Conspirator 1; (iii) the son-in-law and purported successor in interest to the French Family Friends who had allegedly provided the loan; and (iv) and a letter from CERNEA. Each of these individuals claimed to have maintained copies of the promissory note and provided it to ROTTA upon request.

48. The IRS Revenue Agent who handled the audit subsequently inquired about additional transfers ROTTA received from Sky Delta, which totaled $850,000 in 2009, and from Edelwiss, which totaled $2,801,000 between 2009 and 2011. In response, ROTTA falsely claimed that these transfers also were loans and caused the Audit Representatives to provide the IRS additional false promissory notes and letters from CERNEA and Conspirator 1 indicating they had found those notes among their records. ROTTA provided the IRS additional false promissory notes evidencing "loans" purportedly received from Edelwiss in 2012, 2013 and 2014, as well as additional false affidavits and letters from CERNEA evidencing those loans.

49. Despite ROTTA's efforts to deny ownership of any foreign financial accounts, on or about June 24, 2014, the IRS concluded the audit of tax years 2008 through 2010 by issuing ROTTA a Notice of Deficiency in which it proposed income tax deficiencies and penalties for the following years in the following amounts:

| Year | Deficiency | Penalty – I.R.C. 6663(a) |
|------|------------|--------------------------|
| 2008 | $549,601.00 | $412,200.75 |
| 2009 | $481,918.00 | $361,438.50 |
| 2010 | $318,499.00 | $238,874.25 |

50.     The deficiencies assessed for 2008, 2009, and 2010 were based in part on the IRS rejecting ROTTA's claims that money received from Sky Delta and Edelwiss were loans and instead determined ROTTA received "other income" from these entities in the following amounts:

| Year | Income Received | Entities Received From |
|------|-----------------|------------------------|
| 2008 | $1,949,975 | Sky Delta |
| 2009 | $1,700,000 | Sky Delta and Edelwiss |
| 2010 | $1,149,000 | Edelwiss |

**C.     ROTTA Conspired with CERNEA and Others to Bring Funds Onshore During his Audit.**

51.     While the IRS audit and Tax Court litigation were ongoing, ROTTA maintained between $18 and $24 million in assets in the Credit Suisse and Bonhôte Edelwiss accounts. ROTTA continued to actively manage the investments of those accounts and continued to direct transfers from the Edelwiss accounts to himself for his benefit. However, to conceal his use of the funds while he was under audit, ROTTA began routing his transfers from his foreign financial accounts through domestic bank accounts held in the names of CERNEA and others.

52.     For example, ROTTA directed transfers from his offshore accounts to domestic bank accounts held in CERNEA's name. In or around September 2012, a domestic Citibank account was opened in CERNEA's name ("the CERNEA Citibank account"), which was a nominee account under ROTTA's dominion and control. ROTTA maintained a document containing account information for the CERNEA Citibank account at his home on Fisher Island, including login information for online banking; debit card numbers, expiration dates, and security codes; wire instructions for the account; and answers to the account's security questions. The username and password for the CERNEA Citibank account included information personal to ROTTA, rather than CERNEA. In or around May 2015, Attorney 6, a Florida lawyer who

represented ROTTA in various matters for over a decade and was ROTTA's friend, became an authorized signer on the CERNEA Citibank account.

53.     ROTTA used the CERNEA Citibank account as a passthrough to obscure his transfers from the Edelwiss accounts. Between November 2012 and March 2016, the CERNEA Citibank account received 10 wire transfers totaling just over $3.7 million from the Edelwiss accounts, almost all of which was then transferred to domestic accounts owned and/or controlled by ROTTA and to third parties as payment for ROTTA's benefit. At times, ROTTA directed Attorney 6 to make transfers from the CERNEA Citibank account for ROTTA's benefit.

54.     In or around March 2015, representatives from Citibank asked ROTTA to provide information about CERNEA in connection with opening an account purportedly funded by CERNEA. ROTTA provided Citibank a notarized statement from CERNEA, which explained that CERNEA had earned money and inherited additional funds from his parents. The statement from CERNEA also indicated that "Sergio had a close relationship and worked closely with Benno Bacal (Dan's uncle) that left a substantial amount of money with Sergio to be given to Dan's descendent . . . The majority of the assets that will fund the trust are from the Bacal moneys."

55.     During the audit, ROTTA sought to conceal his control of the Edelwiss accounts by directing transfers through attorney trust accounts belonging to Attorney 5 and Attorney 6 For example:

        a.     In or around July 2016, ROTTA transferred $75,000 from the Credit Suisse Edelwiss account to Attorney 5's trust account. Shortly thereafter, ROTTA, directed Attorney 5 via email to transfer $75,000 from Attorney 5's trust account to a car dealership in the Miami area as payment for ROTTA's new Porsche 911 Targa sports car. Attorney 5

transferred the money to the dealership to complete the purchase of ROTTA's new sports car.

b.      In or around February 2016, ROTTA transferred $94,000 from the Credit Suisse Edelwiss account to Attorney 5's trust account. The next day, Attorney 5 transferred $94,000 to Attorney 6's trust account.

c.      At the same time, ROTTA also transferred $55,000 from the Credit Suisse Edelwiss account to Attorney 6's attorney trust account. Shortly thereafter, ROTTA caused Attorney 6 to transfer $126,755 from his attorney trust account to make a payment to his condo building for a building assessment.

56.      During the audit, ROTTA and CERNEA also caused the formation of The Sergio 2014 Trust, a domestic trust purportedly settled by CERNEA in 2014 for the benefit of ROTTA and his son. On paper, it appeared that CERNEA, the grantor, had contributed money to the trust to provide for ROTTA and his son, the beneficiaries. In fact, ROTTA funded the trust with transfers of his own money from the Edelwiss accounts. ROTTA proceeded to use the funds he put in The Sergio 2014 Trust for his own benefit. There were three trustees of The Sergio 2014 Trust, including Attorney 6, who was primary managing trustee of The Sergio 2014 Trust.

**D.      ROTTA and CERNEA Conspired to Keep Swiss Accounts Open and Prevent Their Disclosure to the IRS.**

57.      In or around 2013, it was publicly reported in Miami that ROTTA had been sentenced to a term of imprisonment in the United States. News of ROTTA's arrest and term of imprisonment made its way to Switzerland, and in response Credit Suisse flagged ROTTA's Edelwiss accounts for termination as U.S. related accounts. In response, ROTTA and CERNEA went to Switzerland in or around December 2013, and ROTTA provided Credit Suisse with a letter

in which he made a number of false representations, including, but not limited to: that he was not a U.S. citizen, that he was not substantially present in the United States, and that in the future he would be in the United States on a temporary basis (for stays of no more than four months a year).

### E. ROTTA and CERNEA Conspired to Present False Claims to the United States Tax Court to Defeat the IRS's Assessment.

58.    On or about September 24, 2014, ROTTA caused to be filed a petition in United States Tax Court to contest the IRS's audit determinations of tax deficiencies for tax years 2008 through 2010. The petition repeated ROTTA's false assertions that he did not have any foreign financial accounts and that the funds he received from Sky Delta and Edelwiss were loans.

59.    ROTTA's Tax Court petition claimed that, in 2008, ROTTA "asked long-time family friends . . . for loans;" that the French Family Friends agreed to advance him funds; and that the money would be repaid when ROTTA sold a home he owned in Oyster Bay, New York. According to the petition, the French Family Friends "chose to have the loans made by Sky Delta, Ltd., a Hong Kong Company." In total, the petition claimed that, through Sky Delta, the French Family Friends had advanced ROTTA $1,450,000 (plus interest) in 2008 and $850,000 (plus interest) in 2009. In support of these claims, an Audit Representative attached to the petition "Promissory Notes" purportedly executed by ROTTA in favor of the French Family Friends "in the form in which it was presented to him."

60.    In the petition, ROTTA further falsely claimed that the funds he received from Edelwiss in tax years 2009 and 2010 were loans from CERNEA. Specifically, the petition claimed that in 2009, after the French Family Friends died, ROTTA approached CERNEA for a loan, and CERNEA agreed to lend him $850,000, which was disbursed in two payments through Edelwiss. According to the petition, CERNEA then advanced ROTTA an additional $1 million in 2010

22

through Edelwiss. The petition claimed that CERNEA, like the French Family Friends, expected repayment after ROTTA sold his Oyster Bay home. Finally, the petition falsely claimed that ROTTA signed promissory notes in favor of Edelwiss to repay these loans.

61.     In the petition, ROTTA falsely claimed that there were no deficiencies for the relevant years and falsely alleged that the French Family Friends owned the assets in the Sky Delta accounts and CERNEA owned the assets in the Edelwiss accounts.

62.     In approximately June 2015, ROTTA's Audit Representative provided the IRS with an affidavit from CERNEA and a declaration from Conspirator 1, which perpetuated the false narrative that the funds ROTTA received from the Sky Delta and Edelwiss accounts were loans.

63.     In or around July and August 2016, CERNEA and Conspirator 1 traveled to New York and sat for interviews with IRS counsel regarding the "loans" ROTTA purportedly received from the Sky Delta and Edelwiss accounts. CERNEA falsely represented that he owned Edelwiss; that he extended loans to ROTTA based on their close personal relationship; and that ROTTA would repay the loans made through both Sky Delta and Edelwiss. Conspirator 1 falsely represented that the funds transferred through Sky Delta to ROTTA were bona fide loans from the French Family Friends; and that the loans remained outstanding obligations, which Conspirator 1 expected ROTTA to repay.

64.     In or around December 2016, ROTTA finalized the sale of his home in Oyster Bay, New York for approximately $6,280,000. Shortly after the closing, ROTTA wrote a $4,400,000 million check to CERNEA and a $750,000 check to Conspirator 1, noting on each that the checks were loan repayments. ROTTA then presented through his Audit Representative to the IRS evidence of the sale of the Oyster Bay home and copies of the checks payable to CERNEA and

Conspirator 1 as proof that the payments ROTTA received from Sky Delta and Edelwiss were loans that had been satisfied.

65.     The IRS accepted evidence of the purported loan "repayments" as proof of the loans. On or about February 8, 2017, the IRS consented to settle the Tax Court litigation with ROTTA and agreed that ROTTA owed neither additional income tax nor penalties for 2008 through 2010. The IRS reached this decision based, at least in part, on the interviews of Conspirator 1 and CERNEA, the alleged loan documents, and the purported evidence of loan repayment. On or about March 10, 2017, the IRS also agreed to settle ROTTA's 2011 through 2013 audit, which was on appeal with the IRS. For the same reasons as in the Tax Court case, based upon the fraudulent documents and false testimony it received, the IRS agreed that ROTTA owed no additional income tax or penalties for 2011 through 2013.

66.     The "loan repayments" were fake. The money was ultimately returned to accounts controlled by ROTTA within months of the closure of the IRS audit, as demonstrated below:

a.      Between on or about January 25, 2017, and May 1, 2017, checks totaling $4,400,000—equal to the full amount of ROTTA's purported repayment of the Edelwiss loans—were written from a Regions Bank account held in CERNEA's name and deposited into The Sergio 2014 Trust account at Morgan Stanley. Because ROTTA and his son were the beneficiaries of The Sergio 2014 Trust, ROTTA retained ownership and control over the purported $4,400,000 "repayment" to CERNEA.

b.      On or about January 27, 2017, ten days after ROTTA's purported repayment of the Sky Delta loans, a check payable to CERNEA in the amount of $750,000 – the full

24

amount of the Sky Delta "loans" – was issued from Conspirator 1's Citibank account. That check was deposited into the CERNEA Citibank account on or about February 1, 2017.

       c.     Within a week of the $750,000 deposit to CERNEA's Citibank account, a total of $750,000 was wired from the account to two separate accounts held in the name of The Sergio 2014 Trust. Therefore, ROTTA likewise retained ownership and control over the $750,000 "repayment" to Conspirator 1.

**F.**     **ROTTA Conspired with CERNEA to Create Sham Trust Structures to Continue Evading Taxes.**

67.     In or around November 2016, ROTTA began closing the Edelwiss accounts and transferring the assets to accounts held in the name of The Majestic Trust at another Swiss financial institution headquartered in Zurich, Switzerland ("Swiss Bank 1").

68.     ROTTA and CERNEA caused the formation of The Majestic Trust in or around October 2015. The Majestic Trust, like The Sergio 2014 Trust, was a sham. On paper, it appeared that CERNEA, the grantor, had contributed money to the trust to provide for ROTTA and his son, the beneficiaries. In fact, ROTTA funded the trust with transfers of his own money from the Edelwiss accounts. The trustees of The Majestic Trust were the same as The Sergio 2014 Trust, and Attorney 6 was the primary managing trustee of the trust.

69.     ROTTA caused Attorney 6 to open accounts in the trust's name at Swiss Bank 1 on or about November 14, 2016. In connection with the account opening, Attorney 6 identified The Majestic Trust as the owner of the account and, as trustee, retained signature authority over the accounts. Attorney 6 also caused Swiss Bank 1 to document CERNEA as the settlor of the trust, and to record ROTTA and his son as beneficiaries. This made it appear, on the Swiss Bank 1 account documents, that CERNEA funded The Majestic Trust accounts for the benefit of ROTTA

and his son. In reality, ROTTA owned the assets in the Edelwiss accounts that funded The Majestic

Trust. Furthermore, ROTTA continued to manage the assets in The Majestic Trust accounts as if

they were his own.

70.     In or around 2018, the trustees amended The Majestic Trust to give them discretion

to pay to CERNEA as much of The Majestic Trust's net income and/or principal as they

determined. Thereafter, ROTTA caused distributions from The Majestic Trust's accounts to be

made to the CERNEA Citibank account, and other accounts under ROTTA's control. Thereafter,

ROTTA claimed to The Majestic Trust's accountants that a portion of the trust's income was

distributed to CERNEA, thereby substantially lowering the income ROTTA reported from the

trust, and the taxes ROTTA paid on that income. For example:

      a.     Between December 2018 and May 2019, ROTTA exchanged emails with

an employee of Swiss Company 1, a luxury watch and clock manufacturer located in the

Canton of Geneva, Switzerland, in which ROTTA arranged to purchase a specific luxury

timepiece as a graduation gift for his son and pick it up in Geneva on May 15, 2019. In or

about May 13, 2019, CHF 51,000 was wired from the account of The Majestic Trust at

Swiss Bank 1 to Swiss Company 1 for the purchase of the watch. In or about April 2020,

ROTTA provided his return preparer with a document that falsely identified the transfer of

CHF 51,000 Swiss Company 1 as a distribution to CERNEA.

G.      **ROTTA Filed a False Voluntary Disclosure.**

71.     By in or around 2019, ROTTA was aware that the SFTA would produce certain of his Swiss account records to the IRS in response to a foreign evidence request from the United States. ROTTA was aware those records would reveal that he had made false statements during his audit and that he, CERNEA, and others had defrauded the IRS.

72.     In or around June 2019, ROTTA engaged U.S. counsel and attempted to make a voluntary disclosure to the IRS to limit his exposure to criminal prosecution while simultaneously and fraudulently attempting to limit the penalties he would have to pay the IRS. At that time, under the IRS's Voluntary Disclosure Practice, certain taxpayers who committed tax or tax-related crimes and had criminal exposure due to their willful violation of the law could seek to possibly avoid criminal prosecution, at the discretion of the IRS. To do so, taxpayers had to become tax compliant and make a truthful, timely, and complete disclosure of their past misconduct. Among other things, taxpayers who willfully failed to report their foreign financial accounts could be subject to a penalty of 50% of the highest year's unreported balance.

73.     However, ROTTA submitted a false voluntary disclosure application in which he disclosed his interest in the Edelwiss accounts, and falsely claimed that only $2 million of the assets in the accounts belonged to him, while the rest belonged to CERNEA. Had the IRS accepted ROTTA's false claims, this could have capped his penalty at approximately $1 million.

74.     On or about July 9, 2019, ROTTA, through his attorney, submitted to the IRS Part I of Form 14457, "Voluntary Disclosure Practice Preclearance Request and Application" ("Voluntary Disclosure Application"). In that application, ROTTA admitted that he owned, controlled, or was the beneficial owner of the Edelwiss accounts at Credit Suisse and Banque

Bonhôte. This statement was in direct contrast to what he had previously told the IRS and claimed in his Tax Court petition.

75.     On or about November 8, 2019, ROTTA submitted to the IRS Part II of his Voluntary Disclosure Application, which he signed under penalties of perjury. ROTTA falsely checked "no" in answer to Question 7 on Part II of the Voluntary Disclosure Application, which asked whether "anyone, including a foreign government or a foreign financial institution, advised you that your offshore account records, which are the subject of this voluntary disclosure, were susceptible to being turned over to the U.S. government pursuant to an official request." ROTTA had in fact been notified that the foreign account records that were the subject of his disclosure were susceptible to being turned over to the U.S. government. For example:

        a.     On or about April 24, 2018, Banque Bonhôte's representatives informed ROTTA that the bank considered his Edelwiss and Sky Delta accounts could be subject to disclosure to the U.S. Department of Justice.

        b.     In or around November 2018, Banque Bonhôte notified ROTTA through his Swiss counsel that it had received a request from the U.S. Department of Justice to produce records related to the Edelwiss account.

76.     Part II of ROTTA's Voluntary Disclosure Application also purported to explain the source of funds in the Credit Suisse and Banque Bonhôte Edelwiss accounts and ROTTA's control over those funds. In his submission, ROTTA admitted, for the first time, that he owned and controlled Swiss bank accounts since the 1990s, but he falsely claimed that most of the assets in the Edelwiss accounts – approximately $13 million – came from CERNEA's father, to be held in

trust for CERNEA. ROTTA claimed that $2 million in the accounts belonged to him, which he received in a payment from his first wife's father.

77.     In Part II of ROTTA's Voluntary Disclosure Application, ROTTA purported to explain why CERNEA created trusts for the benefit of ROTTA and his son. ROTTA falsely claimed that it was understood that when he and CERNEA died, all the remaining funds would pass to ROTTA's son because CERNEA had no children. In fact, CERNEA had a son and a daughter.

78.     In Part II of his Voluntary Disclosure Application, ROTTA also falsely claimed that he had attempted to come into compliance with his U.S. tax and reporting obligations. In fact, ROTTA had retained multiple attorneys to represent him in the IRS's audit and in Tax Court, and ROTTA used those attorneys to falsely claim that he did not have any foreign financial accounts.

**H.     ROTTA Used Sham Trust Structures to Bring his Money Back to the United States.**

79.     Between 2019 and 2020, ROTTA caused the closure of The Majestic Trust's accounts at Swiss Bank 1 and directed the transfer of assets in those accounts to new accounts held in The Majestic Trust's name at JP Morgan Chase. Thereafter, ROTTA continued to actively manage The Majestic Trust's accounts at JP Morgan Chase, and regularly directed transfers for his benefit, though he continued to falsely claim that CERNEA received distributions from the trust.

80.     For tax years 2017 through 2020, ROTTA filed and/or caused the filing of false tax returns that falsely and fraudulently underreported his total income by, among other things, failing to report all the income generated by the assets in The Majestic Trust's accounts.

## COUNT ONE
### (Conspiracy to Defraud the United States)

81.     The allegations set forth in Paragraphs 1 through 80 of this Superseding Indictment are re-alleged and expressly incorporated herein as if copied verbatim.

82.     From in or around 2010 through the present, in the Southern District of Florida and elsewhere, the defendants, **DAN ROTTA**, **SERGIO CERNEA**, Conspirator 1, and others, known and unknown to the grand jury, did knowingly and willfully conspire, confederate, and agree together and with others, both known and unknown to the grand jury, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service of the United States Department of Treasury, in the ascertainment, computation, assessment, and collection of the revenue, that is, ROTTA's federal income taxes.

### Manner and Means of the Conspiracy

83.     Among the manners and means by which ROTTA, CERNEA, and their conspirators carried out their conspiracy were the following:

a.     ROTTA held assets in Swiss bank accounts using false names and nominee offshore corporate structures which were designed to conceal his ownership and control of those accounts from the IRS.

b.     ROTTA and CERNEA falsely represented to Swiss authorities that ROTTA was a Brazilian citizen who lived and worked in Brazil and was therefore not a U.S. person subject to U.S. income tax to prevent the disclosure of ROTTA's Swiss bank account records to the IRS.

c.     ROTTA and CERNEA caused Bonhôte Trust to implement a new ownership structure for the Edelwiss accounts that falsely named CERNEA as the

beneficial owner of the assets in those accounts. Despite that nominal change, ROTTA continued to control and use the assets in the Edelwiss accounts for his own benefit, without reporting their existence or the income they generated to the IRS.

      d.     ROTTA and CERNEA caused the opening of nominee domestic bank and financial accounts in CERNEA's name that ROTTA effectively maintained and controlled.

      e.     ROTTA, CERNEA, and others made, and caused others to make, false statements to the IRS regarding ROTTA's ownership and control of his foreign financial accounts and the assets contained therein.

      f.     ROTTA and CERNEA told false shifting stories to explain the source of the funds in ROTTA's foreign financial accounts to conceal ROTTA's ownership and control of the accounts and the assets held therein from the IRS. The consistent theme in these stories was ROTTA and CERNEA always traced the source of the funds to individuals who were deceased or beyond the jurisdiction of a United States court.

      g.     ROTTA, CERNEA, and others submitted, and caused others to submit, false documents to the IRS regarding ROTTA's ownership and control of his foreign financial accounts and the assets contained therein.

      h.     ROTTA submitted, and caused others to submit, a false petition to the United States Tax Court to conceal his ownership and control of his foreign financial accounts and the assets contained therein.

      i.     ROTTA and CERNEA caused the formation of sham trust structures ROTTA used to conceal his foreign financial accounts and income from the IRS.

j.     ROTTA and CERNEA caused the opening of domestic and foreign bank and financial accounts held in the names of the sham trusts to conceal ROTTA's ownership and control of the assets held in those accounts.

k.     ROTTA transferred, and caused others to transfer, funds through attorney trust accounts and used funds in those attorney trust accounts for his personal expenses to conceal his ownership and control of foreign financial accounts.

l.     ROTTA submitted, and caused to be submitted, false information to his return preparers for use in the preparation of income tax returns.

m.     ROTTA submitted, and caused to be submitted, false Forms 1040 that underreported his total income and failed to report his ownership and control of foreign financial accounts.

n.     ROTTA submitted, and caused others to submit, a Voluntary Disclosure Application to the IRS that contained false information, including falsely explaining most of the funds in ROTTA's foreign financial accounts as belonging to CERNEA.

### Overt Acts

84.     In furtherance of the conspiracy and to affect the illegal objects thereof, ROTTA, CERNEA, and their conspirators, in the Southern District of Florida and elsewhere, committed and caused to be committed the following overt acts, among others, each sub-paragraph constitutes a separate overt act:

a.     In or around July 2010, ROTTA and CERNEA submitted false affidavits to the SFTA falsely representing that ROTTA was a Brazilian resident who was not subject to U.S. income tax.

b.      In or around November 2011, ROTTA and CERNEA caused Credit Suisse and Banque Bonhôte to falsely record on Forms A that CERNEA was the beneficial owner of the assets in the Edelwiss accounts.

c.      In or around December 2011, ROTTA caused his Audit Representatives to falsely represent to the IRS that ROTTA did not have any foreign financial accounts.

d.      In or around May 2012, ROTTA falsely told an IRS Revenue Agent that he did not have any foreign financial accounts or foreign business activity of any kind. ROTTA also caused his accountant and representative to falsely represent that he did not have any foreign financial accounts.

e.      In or around October 2012, ROTTA falsely told an IRS Revenue Agent he did not have any foreign financial accounts. ROTTA also caused his attorney to falsely represent that ROTTA did not have any foreign financial accounts.

f.      In or around November 2012, ROTTA falsely told an IRS Revenue Agent that he did not have any foreign financial accounts. ROTTA also falsely told the Revenue Agent that he did not have a safe deposit box either in 2008 (the year under audit) or at the time of the interview, in 2012.

g.      Between 2012 and 2017, ROTTA, CERNEA, and Conspirator 1, provided, and caused others to provide, false loan documents to the IRS to support ROTTA's claim that money he received from Sky Delta and Edelwiss were loans.

h.      On or about June 23, 2014, ROTTA and CERNEA caused the formation of The Sergio 2014 Trust, to enable ROTTA to conceal assets and income held in foreign and domestic bank and financial accounts.

i.      On or about November 12, 2014, ROTTA provided false testimony under penalties of perjury regarding his unreported foreign financial accounts.

j.      On or about May 20, 2015, ROTTA provided false testimony under penalties of perjury regarding his unreported foreign financial accounts.

k.      In or around 2015, ROTTA and CERNEA caused the formation of The Majestic Trust, to enable ROTTA to conceal assets and income held in foreign and domestic bank and financial accounts.

l.      In or around November 2016, ROTTA and CERNEA opened, and caused to be opened, financial accounts at Swiss Bank 1 in the name of The Majestic Trust.

m.      In or around 2016, ROTTA caused the closure of the Edelwiss accounts and directed the transfer of the assets in those accounts to The Majestic Trust's accounts at Swiss Bank 1.

n.      In or around January 2017, ROTTA caused false documents to be submitted to the IRS evidencing purported repayment of false loans.

o.      In or around 2018, ROTTA and CERNEA caused The Majestic Trust to be amended to give the trustees the discretion to pay CERNEA so much of The Majestic Trusts' net income and/or principal as they determined.

p.      Between in or around 2018 and 2021, ROTTA falsely told his accountant that CERNEA had received distributions from The Majestic Trust.

q.      In or around 2019, ROTTA caused his Swiss wealth advisors to submit a false invoice to his return preparer that falsely characterized the non-deductible asset

34

management fees they charged to The Majestic Trust as deductible "legal fees" to lower the trust's income.

      r.     In or around November 2019, ROTTA caused the submission of a false Voluntary Disclosure Application to the IRS that reported his previously undeclared foreign financial accounts, but falsely claimed that most of the funds in those accounts belonged to CERNEA.

      s.     In or around 2019, ROTTA used funds from The Majestic Trust's accounts at Swiss Bank 1 to purchase a luxury timepiece as a graduation gift for his son.

      t.     In or about April 2020, ROTTA provided his return preparer with a document that falsely identified the purchase of his son's graduation gift as a distribution to CERNEA.

      u.     On or about the dates listed below, ROTTA caused the submission of false Forms 1040 to the IRS, including that the returns underreported his total income.

| Tax Year | Form | Approximate Filing Date |
|---|---|---|
| 2010 | Form 1040 | May 9, 2011 |
| 2011 | Form 1040 | November 5, 2012 |
| 2012 | Form 1040 | June 10, 2013 |
| 2013 | Form 1040 | October 6, 2014 |
| 2014 | Form 1040 | August 30, 2015 |
| 2015 | Form 1040 | September 6, 2016 |
| 2016 | Form 1040 | March 31, 2017 |
| 2017 | Form 1040 | October 18, 2018 |
| 2018 | Form 1040 | March 10, 2019 |
| 2018 | Form 1040X | August 26, 2020 |
| 2019 | Form 1040 | August 22, 2020 |
| 2019 | Form 1040X | March 4, 2022 |
| 2020 | Form 1040 | August 25, 2021 |

All in violation of Title 18, United States Code, Section 371.

35

**COUNTS TWO through SEVEN**
**(Tax Evasion – Tax Years 2008 through 2013)**

85.     The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in paragraphs 1 through 80 of this Superseding Indictment.

86.     Beginning in or around 2009 and continuing through in or around January 2017, in the Southern District of Florida and elsewhere, defendant **DAN ROTTA** did willfully attempt to evade and defeat a substantial part of the income taxes due and owing by ROTTA for tax years 2008 through 2013, each year constituting a separate violation, by filing false Forms 1040, U.S. Individual Income Tax Returns, for those tax years, and by committing the following affirmative acts of evasion, among others:

        a.      In or around December 2011, ROTTA caused his representative to falsely represent to the IRS that he did not have any foreign financial accounts.

        b.      In or around May 2012, ROTTA falsely told an IRS Revenue Agent that he did not have any foreign financial accounts or foreign business activity of any kind. ROTTA also caused his accountant and representative to falsely represent that ROTTA did not have any foreign financial accounts.

        c.      In or around October 2012, ROTTA falsely told an IRS Revenue Agent he did not have any foreign financial accounts. ROTTA also caused his attorney to falsely represent that ROTTA did not have any foreign financial accounts.

        d.      In or around November 2012, ROTTA falsely told an IRS Revenue Agent that he did not have any foreign financial accounts. ROTTA also falsely told the Revenue Agent that he did not have a safe deposit box in 2008 (the year under audit) or at the time of the interview, in 2012.

36

      e.       Between 2012 and 2017, ROTTA, CERNEA, and Conspirator 1 provided, and caused to be provided, false loan documents to the IRS to support ROTTA's claim that money he received from Sky Delta were loans.

      f.       On or about November 12, 2014, ROTTA provided false testimony under penalties of perjury regarding his unreported foreign financial accounts.

      g.       On or about May 20, 2015, ROTTA provided false testimony under penalties of perjury regarding his unreported foreign financial accounts.

      h.       In or around January 2017, ROTTA caused false documents to be submitted to the IRS evidencing repayment of the false loans.

Each tax year in violation of Title 26, United States Code, Section 7201.

## COUNTS EIGHT through EIGHTEEN
### (Filing False Tax Returns)

87.     The Grand Jury hereby realleges and incorporates by reference, as though fully set

forth herein, the allegations contained in paragraphs 1 through 80 of this Superseding Indictment.

88.     On or about the date set forth below in each count, in the Southern District of

Florida, defendant **DAN ROTTA**, willfully made and subscribed the following false forms, each

of which were verified by a written declaration made under the penalties of perjury and which

ROTTA did not believe to be true and correct as to the following material matters, among others:

| Count | Tax Year | Form | Approximate Filing Date | False Material Matter |
|---|---|---|---|---|
| 8 | 2014 | Form 1040 | 8/30/2015 | Taxable Interest, Line 8a: $135,418<br>Total Income, Line 21: ($1,942,677)<br>Schedule B, Part III, Line 7(a): "No"<br>Schedule B, Part III, Line 7(b): "No" |
| 9 | 2015 | Form 1040 | 9/06/2016 | Taxable Interest, Line 8a: $159,964<br>Total Income, Line 22: ($2,036,920)<br>Schedule B, Part III, Line 7(a): "No" |
| 10 | 2016 | Form 1040 | 3/31/2017 | Taxable Interest, Line 8a: $161,919<br>Total Income, Line 22: ($1,992,131)<br>Schedule B, Part III, Line 7(a): "No" |
| 11 | 2017 | Form 1040 | 10/18/2018 | Taxable Interest, Line 8a: $995,101<br>Total Income, Line 22: ($1,223,332) |
| 12 | 2018 | Form 1040 | 3/10/2019 | Taxable Interest, Line 2b: $342,348<br>Total Income, Line 6: ($168,712) |
| 13 | 2018 | Amended Form 1040 | 8/26/2020 | Taxable Interest, Line 2b: $290,530<br>Total Income, Line 6: ($21,737) |
| 14 | 2019 | Form 1040 | 8/22/2020 | Taxable Interest, Line 2b: $274,924<br>Total Income, Line 7b: ($93,396) |
| 15 | 2019 | Amended Form 1040 | 3/4/2022 | Taxable Interest, Line 2b: $295,774<br>Total Income, Line 7b: ($6,640) |
| 16 | 2020 | Form 1040 | 8/25/2021 | Taxable Interest, Line 2b: $175,938<br>Total Income, Line 9: $6,344 |
| 17 | 2021 | Form 1040 | 7/14/2022 | Taxable Interest, Line 2b: $49,993<br>Total Income, Line 9: $513,507 |
| 18 | 2022 | Form 1040 | 4/13/2023 | Taxable Interest, Line 2b: $20,609<br>Total Income, Line 9: $857,481 |

Each count in violation of Title 26, United States Code, Section 7206(1).

## COUNT NINETEEN
### (False Statements in a Document)

89.     The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in paragraphs 1 through 80 of this Superseding Indictment.

90.     On or about November 8, 2019, **DAN ROTTA**, in the Southern District of Florida, did willfully and knowingly make and cause to be made, and use and cause to be used, in a matter within the jurisdiction of the executive, legislative, or judicial branch of the government of the United States, a false writing or document, knowing the same to contain a materially false, fictitious, and fraudulent statement. ROTTA submitted a materially false Voluntary Disclosure Application to the IRS on or about November 8, 2019, in the Southern District of Florida, that contained false statements, including, but not limited to, the following: (i) that ROTTA had attempted to come into compliance with his U.S. tax and reporting obligations; (ii) that the majority of the assets in his foreign financial accounts belonged to CERNEA; and (iii) that CERNEA had contributed the money to a trust for ROTTA and his son's benefit because CERNEA had no children. ROTTA well knew that (i) he falsely claimed and caused to be falsely claimed that ROTTA did not have any foreign financial accounts and contested and caused to be contested the disclosure of his foreign financial accounts to the United States, (ii) the assets in those accounts belonged to ROTTA, and (iii) that CERNEA had two adult children.

In violation of Title 18, United States Code, Section 1001(a)(3).

## COUNTS TWENTY AND TWENTY-ONE
### (Failure to File FBARs – Calendar Years 2015 and 2016)

91.    The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in paragraphs 1 through 80 of this Superseding Indictment.

92.    On or about the dates set forth below, in the Southern District of Florida, defendant **DAN ROTTA**, did willfully fail to file with the U.S. Department of the Treasury an FBAR disclosing that he had a financial interest in, and signature and authority over, a bank, securities, and financial account in a foreign country, which had an aggregate value exceeding $10,000 during the years listed below:

| Count | Calendar Year | Deadline | Qualifying Accounts that were Not Disclosed |
|-------|---------------|----------|---------------------------------------------|
| 20 | 2015 | June 30, 2016 | Credit Suisse and Bonhôte Edelwiss Accounts |
| 21 | 2016 | October 15, 2017 | Credit Suisse and Bonhôte Edelwiss Accounts |

Each count in violation of Title 31, United States Code, Sections 5314 & 5322(a); 31 Code of Federal Regulations, Sections 1010.350, 1010.306(c)-(d), and 1010.840(b).

## COUNT TWENTY-TWO
## (Corrupt Interference with Administration of Internal Revenue Laws)

93.     The Grand Jury hereby realleges and incorporates by reference, as though fully set forth herein, the allegations contained in paragraphs 1 through 80 of this Superseding Indictment.

94.     In or around 2019, the IRS operated a program called the Voluntary Disclosure Practice, which provided a way for taxpayers who had willfully failed to comply with their tax or tax-related obligations to submit a voluntary disclosure as a possible means to resolve their non-compliance and potentially limit their exposure to criminal prosecution. There was a two-part process for taxpayers to apply to participate in the Voluntary Disclosure Practice.

    a.     First, taxpayers were required to fill out Part I of the Voluntary Disclosure Application, on which taxpayers provided basic information about themselves and their disclosure. IRS Criminal Investigation ("IRS-CI") used that information to check various IRS databases to ensure the taxpayer was eligible for the Voluntary Disclosure Practice. If the taxpayer was eligible, IRS-CI notified the taxpayer they were precleared to make a voluntary disclosure. Preclearance determined the taxpayers' eligibility for the Voluntary Disclosure Practice but did not guarantee preliminary acceptance into the practice.

    b.     Second, after the taxpayer received preclearance confirmation, they were required to submit Part II of the Voluntary Disclosure Application, which required taxpayers to provide detailed information regarding their non-compliance, including (i) a narrative providing the facts and circumstances, and (ii) assets, entities, related parties, and any professional advisors involved in the noncompliance. IRS-CI then reviewed the taxpayers' submission, and if approved to participate, the taxpayers were provided with a Preliminary Acceptance Letter, and their Voluntary Disclosure Application was then

41

forwarded to the civil section of the IRS where it would be assigned to an IRS Revenue Agent for examination.

95.     After taxpayers received their Preliminary Acceptance Letter, an IRS Revenue Agent would conduct a civil examination to determine the taxpayer's liability. The taxpayer was required to cooperate promptly and fully during the civil examination by providing truthful and accurate documents and information to help the examiner determine the taxpayers' liability. However, if at any point during the examination the IRS determined that the taxpayer had not been fully cooperative or had provided materially false information, the taxpayer could be referred back to IRS-CI for criminal investigation.

96.     As alleged in paragraphs 71 through 78 of this Superseding Indictment, starting in or around 2019, ROTTA attempted to make a false voluntary disclosure to limit his exposure to criminal prosecution while providing false information to obstruct the IRS's civil examination of ROTTA's true tax liability.

      a.     On or about July 9, 2019, ROTTA submitted Part I of his Voluntary Disclosure Application, seeking preclearance to make a voluntary disclosure.

      b.     On or about September 26, 2019, the IRS informed ROTTA that he was precleared.

      c.     On or about November 8, 2019, ROTTA submitted Part II of his Voluntary Disclosure Application, in which he purported to explain his non-compliance. As alleged in Paragraphs 71 through 78, ROTTA provided materially false information in Part II of his Voluntary Disclosure Application to simultaneously limit his exposure to prosecution and obstruct the IRS's civil exam of his tax liability.

d.      On or about November 26, 2019, ROTTA was preliminarily accepted into the IRS's Voluntary Disclosure Practice, and ROTTA was informed that his initial voluntary disclosure application was being forwarded to the civil section of the IRS where his case would be assigned to an IRS Revenue Agent to examine his tax liability.

e.      On or about March 24, 2020, unbeknownst to ROTTA, the IRS revoked ROTTA's preliminary acceptance to the Voluntary Disclosure Practice, and he was referred back to IRS-CI for criminal investigation. The IRS did so after it discovered that ROTTA had provided materially false information in his Voluntary Disclosure Application. The IRS informed ROTTA that his preliminary acceptance had been revoked on or about June 24, 2021, when the IRS's criminal investigation became overt.

97.     Beginning on or about July 9, 2019, and continuing through at least June 24, 2021, **DAN ROTTA**, in the Southern District of Florida, corruptly obstructed and impeded, and corruptly endeavored to obstruct and impede, the due administration of the internal revenue laws by committing and causing to be committed the following acts, among others, intended to obstruct the IRS's civil examination initiated by ROTTA's Voluntary Disclosure Application:

a.      Filing a Voluntary Disclosure Application with the IRS that falsely claimed that (i) ROTTA had attempted to come into compliance with his U.S. tax and reporting obligations; (ii) most of the assets in ROTTA's foreign financial accounts belonged to CERNEA; and (iii) CERNEA had contributed the money to a trust for ROTTA and his son's benefit because CERNEA had no children.

b.      Causing CERNEA to make false statements under oath in preparation for negotiations with IRS regarding ROTTA's false Voluntary Disclosure Application.

43

All in violation of Title 26, United States Code, Section 7212(a).

        DAVID A. HUBBERT
        PRINCIPAL DEPUTY ASSISTANT ATTORNEY GENERAL

        Sean Beaty, Senior Litigation Counsel
        District Court No. A5501870
        Mark Daly, Senior Litigation Counsel
        District Court No. A5501435
        Patrick Elwell, Trial Attorney
        District Court No. A5502696
        William Montague, Trial Attorney
        District Court No. A5502569
        U.S. Department of Justice, Tax Division
        (202) 616-2717
        Sean.P.Beaty@usdoj.gov

        A TRUE BILL

        FOREPERSON

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

CASE NO.: 24-20113-CR-SMITH(s)

v.

DAN ROTTA and
SERGIO CERNEA,

**CERTIFICATE OF TRIAL ATTORNEY**

                                      /
                  Defendants.

**Court Division** (select one)

☒ Miami   ☐ Key West   ☐ FTP
☐ FTL     ☐ WPB

**Superseding Case Information:**
New Defendant(s) (Yes or No) No
Number of New Defendants ___0___
Total number of new counts ___3___

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. §3161.

3. Interpreter: (Yes or No) No
   List language and/or dialect: _____

4. This case will take ___20___ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                (Check only one)
   I    ☐ 0 to 5 days              ☐ Petty
   II   ☐ 6 to 10 days             ☐ Minor
   III  ☒ 11 to 20 days            ☐ Misdemeanor
   IV   ☐ 21 to 60 days            ☒ Felony
   V    ☐ 61 days and over

6. Has this case been previously filed in this District Court? (Yes or No) Yes
   If yes, Judge Smith _____ Case No. 24-CR-20113

7. Has a complaint been filed in this matter? (Yes or No) No
   If yes, Magistrate Case No. _____

8. Does this case relate to a previously filed matter in this District Court? (Yes or No) Yes
   If yes, Judge Martinez; Ruiz _____ Case No. 24-MJ-2479-Reid

9. Defendant(s) in federal custody as of _____

10. Defendant(s) in state custody as of _____

11. Rule 20 from the _____ District of _____

12. Is this a potential death penalty case? (Yes or No) No

13. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard? (Yes or No) No

14. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss? (Yes or No) No

15. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? No

16. Did this matter involve the participation of or consultation with now Magistrate Judge Marta Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? No

By: _____
     Sean Beaty, U.S. Dept. of Justice, Tax Division
     DOJ Trial Attorney
     Court ID No.      A5501870

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. <u>24-20113-CR-SMITH(s)</u>**

**<u>PENALTY SHEET</u>**

**Defendant's Name:  DAN ROTTA**

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|-------|-----------|-----------|--------------|
| 1 | Conspiracy to Defraud the United States | 18 U.S.C. § 371 | <u>Max Imprisonment</u>: 5 years<br><u>Max Fine</u>: $250,000 or twice the greater of the gross gain or loss<br><u>Max Supervised Release Term</u>: 3 years |
| 2-7 | Tax Evasion (2008 thru 2013) | 26 U.S.C. § 7201 | <u>Max Imprisonment</u>: 5 years<br><u>Max Fine</u>: $250,000 or twice the greater of the gross gain or loss<br><u>Max Supervised Release Term</u>: 3 years |
| 8-18 | Filing False Tax Returns (2014 thru 2022) | 26 U.S.C. § 7206(1) | <u>Max Imprisonment</u>: 3 years<br><u>Max Fine</u>: $250,000 or twice the greater of the gross gain or loss<br><u>Max Supervised Release Term</u>: 1 year |
| 19 | False Statements in a Document | 18 U.S.C. § 10001(a)(3) | <u>Max Imprisonment</u>: 5 years<br><u>Max Fine</u>: $250,000 or twice the greater of the gross gain or loss<br><u>Max Supervised Release Term</u>: 3 years |
| 20-21 | Failure to File FBARs (Reports of Foreign Bank Accounts) (2015 thru 2016) | 31 U.S.C. § 5314 & 5322(a) | <u>Max Imprisonment</u>: 5 years<br><u>Max Fine</u>: $250,000 or twice the greater of the gross gain or loss<br><u>Max Supervised Release Term</u>: 3 years |
| 22 | Corrupt Interference with Administration of Internal Revenue Laws | 26 U.S.C. § 7212(a) | <u>Max Imprisonment</u>: 3 years<br><u>Max Fine</u>: $250,000 or twice the greater of the gross gain or loss<br><u>Max Supervised Release Term</u>: 1 year |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 24-20113-CR-SMITH(s)**

**PENALTY SHEET**

**Defendant's Name:   SERGIO CERNEA**

| COUNT | VIOLATION | U.S. CODE | MAX. PENALTY |
|---|---|---|---|
| 1 | Conspiracy to Defraud the United States | 18 U.S.C. § 371 | Max Imprisonment: 5 years<br>Max Fine: $250,000 or twice the greater of the gross gain or loss<br>Max Supervised Release Term: 3 years |